Rel: May 1, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2025-2026

———————————————

## CL-2025-0736

———————————————

## A.N.F.

## v.

## D.F.

## Appeal from Lamar Juvenile Court
## (JU-23-107.02)

EDWARDS, Judge.

A.N.F. ("the mother") appeals from a judgment entered by the Lamar Juvenile Court ("the juvenile court") that adjudicated her daughter, K.R.F. ("the child"), whose date of birth is June 6, 2023, dependent and awarded the child's maternal great-grandmother, D.F.

("the maternal great-grandmother"), sole legal and physical custody of the child.

## Procedural Background

This is the second time these parties have been before this court. In <u>A.N.F. v. D.F.</u>, [Ms. CL-2024-0691, June 13, 2025] ___ So. 3d ___ (Ala. Civ. App. 2025), this court dismissed the mother's appeal from a judgment entered by the juvenile court on the basis that that judgment was a void judgment because it failed to adjudicate the child as a dependent child and yet maintained the child's placement with the maternal great-grandmother.

While <u>A.N.F.</u> was pending before this court, the maternal great-grandmother, on December 12, 2024, filed in the juvenile court a new petition, again alleging that the child was dependent and seeking ex parte relief. On December 12, 2024, the juvenile court entered an ex parte order that awarded the maternal great-grandmother pendente lite custody of the child. That ex parte order further limited the mother's visitation with the child to supervised visits every other Saturday from 12:00 p.m. until 4:00 p.m., appointed a guardian ad litem to represent the interests of the child, and scheduled a hearing to occur on January 30,

2025. Following a hearing, the juvenile court, on February 3, 2025, entered an order that maintained the child's pendente lite placement with the maternal great-grandmother, maintained the mother's supervised visitation with the child, and scheduled a final hearing to occur on March 31, 2025.

Following a continuance, the juvenile court, on August 15, 2025, conducted a trial on the maternal great-grandmother's dependency petition. On August 25, 2025, the juvenile court entered a judgment that adjudicated the child dependent, pursuant to Ala. Code 1975, § 12-15-102(8), awarded the maternal great-grandmother legal and physical custody of the child, and awarded the mother unsupervised visitation with the child on alternating weekends, as well as certain extended holiday visitation.

On September 2, 2025, the mother filed a postjudgment motion seeking to alter, amend, or vacate that portion of the juvenile court's judgment that adjudicated the child dependent because, she argued, that adjudication was not supported by clear and convincing evidence. On that same day, the mother also filed a notice of appeal to this court. The mother's appeal was held in abeyance pending the denial of her

3

postjudgment motion by the juvenile court on September 4, 2025. See Rule 4(a)(5), Ala. R. App. P.; K.R.S. v. DeKalb Cnty. Dep't of Hum. Res., 236 So. 3d 910, 912 (Ala. Civ. App. 2017).

## The Evidence

The maternal great-grandmother testified that the child, who was two years old at the time of the second dependency trial, had been in her physical custody since the child was one month old. At the time of the trial in August 2025, the maternal great-grandmother was residing in Millport in a home that she shared with A.F., her husband. Also, a couple of months before the trial, the maternal great-grandmother's 42-year-old son, C.F. ("the maternal grandfather"), and his wife, B.F., had relocated from their apartment to temporarily reside in the maternal great-grandmother's home while they sought other living arrangements. The maternal great-grandmother was unaware of the whereabouts of the child's father.

At the time the maternal great-grandmother filed her second dependency petition in December 2024, the mother, who was residing in Smithville, Mississippi, with her boyfriend, Z.G., and his two children, was exercising unsupervised visitation with the child beginning on

4

Friday of each week through the following Monday. According to the maternal great-grandmother, she had observed several issues with the child following her visitations with the mother, which, the maternal great-grandmother said, had resulted in her filing the second dependency petition. Those issues included the child's being unclean and thirsty, as well as the child's clothing being dirty and ill-fitting. The maternal great-grandmother said that the child would also return from her visits with the mother covered with scrapes, ant bites, and other unidentified insect whelps.

Of particular concern for the maternal great-grandmother was an abrasion to the child's face that had occurred when the child was visiting the mother. According to the maternal great-grandmother, during discussions with the mother about the child's injury, the mother had informed the maternal great-grandmother that the child had scuffed her face when the child had tripped and fallen. The maternal great-grandmother said that, because of that injury, she had had the child examined at the emergency room. During that visit to the emergency room, hospital personnel contacted the local Department of Human Resources ("DHR"), which, according to the maternal great-

5

grandmother, had opined that it was not child abuse for a child to trip and fall.

Regarding the injury to the child's face, the mother explained that the child had tripped on a step and had fallen to the ground. She said that she had picked up the child and applied medicine to the scrape on her face. The mother denied that she had been contacted by DHR regarding any investigation into the injury to the child's face.

The maternal great-grandmother also expressed concerns regarding the stability of the mother's relationship with Z.G. According to the maternal great-grandmother, on one occasion, the mother had phoned the maternal great-grandmother and reported that she and Z.G. had gotten into an argument and that the mother had been forced to leave her job to take Z.G.'s automobile, which she had been driving, to him. The following day, the mother had appeared at the maternal great-grandmother's house to visit the child, but, the maternal great-grandmother said, Z.G. had not accompanied the mother to that visit. According to the maternal great-grandmother, Z.G. had not been back to her house.

The maternal grandfather said that he too had concerns about the mother's relationship with Z.G. According to the maternal grandfather, on December 2, 2024, the mother had contacted him by telephone and informed him that she could not yet go to work but that she could not stay at her house because she and Z.G. had been arguing. The maternal grandfather said that he had sent B.F. to pick up the mother at the mother's house in Smithville because the mother had no transportation because she had lost access to Z.G.'s automobile, which was the mother's only form of transportation. At that time, the maternal grandfather and his wife were still residing in an apartment as they had not yet moved into the maternal great-grandmother's home.

B.F. testified that, at the maternal grandfather's request, she had traveled to the mother's house in Smithville on December 2, 2024, and had brought the mother back to their apartment. She said that, when she arrived at the mother's house, which she described as "filthy," the mother and Z.G. were both present. B.F. said that she observed old food on the stove and blankets hung in each doorway, which she had presumed were being used to keep the heat in. B.F. also expressed concern regarding the car seat that the mother used for the child, which B.F.

7

described as moldy, as well as the child's sippy cups, which she described as having rubber parts that were mildewed. B.F. said that she and the mother cleaned the car seat and the sippy cups. The mother informed B.F. that she was moving out of the house because of an argument that she had had with Z.G., but, B.F. said, the mother had not disclosed the specifics of that argument to her.

The mother stayed at the maternal grandfather's apartment for a week before she returned to her house in Smithville. The maternal grandfather said that he had supervised some of the mother's visits with the child, and he expressed concerns regarding the mother's attentiveness to the child during those visits as well as the mother's lengthy bathroom breaks. According to B.F., during the visits between the mother and the child that she and the maternal grandfather had supervised, the child had not responded positively to the mother and had cried every time the mother attempted to interact with her. The maternal great-grandmother testified that she did not see a bond between the child and the mother. The maternal great-grandmother said that, when the child was tired or injured, she would run to her and not to the mother. Regarding her relationship with the child, the mother said

8

that she had attempted to develop a bond with the child but admitted that she had not been able to do so despite her efforts.

When the mother returned to her house in Smithville in December 2024, she left two notebooks at the maternal grandfather's apartment. The maternal grandfather testified that he had reviewed those notebooks and that they had contained examples of the mother's playing "hangman," which he described as a word game. According to the maternal grandfather, included in that section of the notebook were phrases such as "daddy is so handsome," as well as more explicit phrases such as "daddy likes to suck toes" and "f*** me hard." The maternal grandfather stated that he had given the notebooks to the maternal great-grandmother because "my granddaughter does not need to be around that, nothing like that." The child was two years old at that time.

The mother admitted that the notebooks that the maternal great-grandmother and the maternal grandfather had mentioned in their testimony were hers. She, however, denied that any child had been exposed to the "sexual things" that she had written in the notebooks. She also denied that any child had witnessed any sexual act between her and any other individual.

9

According to the maternal great-grandmother, the mother suffers from various mental-health issues, including bipolar disorder, borderline personality disorder, and depression. She said that the mother's mental-health issues make it difficult to communicate with the mother without saying the wrong thing and upsetting her. The maternal great-grandmother, the maternal grandfather, and B.F. all testified that they did not think that the mother takes her mental-health medication as prescribed. B.F. said that she had asked the mother if she was taking her medication and that the mother had responded: "[S]ometimes." The maternal great-grandmother also said that she could tell when the mother was not taking her medication as prescribed because the mother would become defiant and yell during conversations.

The mother admitted that she had been diagnosed with bipolar disorder, depression, and anxiety, but she denied that she had been diagnosed with borderline personality disorder. She said that she had been prescribed the medications Celexa and Latuda by her "medicine doctor," who she identified as Dr. Ashley Davis. The mother said that she had last seen Dr. Davis approximately three months before the trial. The mother also testified that she was in counseling.

The mother admitted that she had informed the maternal grandfather that she took her medicine "sometimes." She clarified that she would not take her medicine when she did not eat or when she was sick because it made her nauseated. According to the mother, she had been compliant with her medication regimen in the month leading up to the trial.

At the time of the trial, the mother and Z.G. had been dating for two years. He had maintained his employment at Holman Forestry for five years and was earning $1,000 per week. Z.G.'s children were ages six and eight and were in the first and third grades. The mother testified that she had been employed at two different jobs but that she had quit those jobs when Z.G. had purchased a new four-bedroom, two-bath house in Golden, Mississippi. That house was a 40-minute commute to the mother's former places of employment, which, she said, made keeping those jobs untenable. The mother said that she was scheduled to begin a new job at a local fast-food restaurant at 10:00 a.m. on the Monday following the trial. She said that she would be earning $11 per hour at that job.

11

The mother requested that the juvenile court allow the child to come home. She said that she loved and missed the child and admitted that, because the child was her first child, she had not known how to parent. She, however, opined that she had gained parenting skills through caring for Z.G.'s children. The mother said that she had everything that she needed to care for the child and that she was ready for the child to be returned to her care.

Standard of Review

A judgment adjudicating a child as dependent must be supported by clear and convincing evidence, which is "'"[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion."'" C.O. v. Jefferson Cnty. Dep't of Hum. Res., 206 So. 3d 621, 627 (Ala. Civ. App. 2016) (quoting L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002), quoting in turn Ala. Code 1975, § 6-11-20(b)(4)).

> "'[T]he evidence necessary for appellate affirmance of a judgment based on a factual finding in the context of a case in which the ultimate standard for a factual decision by the trial court is clear and convincing evidence is evidence that a fact-finder reasonably could find to

12

clearly and convincingly … establish the fact sought to be proved.'

"KGS Steel, [Inc. v. McInish,] 47 So. 3d [749,] 761 (Ala. Civ. App. 2006).

"… [F]or trial courts ruling … in civil cases to which a clear-and-convincing-evidence standard of proof applies, 'the judge must view the evidence presented through the prism of the substantive evidentiary burden[,]' [Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)]; thus, the appellate court must also look through a prism to determine whether there was substantial evidence before the trial court to support a factual finding, based upon the trial court's weighing of the evidence, that would 'produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion.' [Ala. Code 1975, § 25-5-81(c).]"

Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008). This court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing. See Ex parte T.V., 971 So. 2d 1, 9 (Ala. 2007). When those findings rest on ore tenus evidence, this court presumes their correctness. Id. We review the legal conclusions to be drawn from the evidence without a presumption of correctness. J.W. v. C.B., 68 So. 3d 878, 879 (Ala. Civ. App. 2011).

13

Discussion

In the present case, the juvenile court adjudicated the child dependent, pursuant to Ala. Code 1975, § 12-15-102(8), which defines a dependent child as "[a] child who ha[s] been adjudicated dependent by a juvenile court and is in need of care or supervision" and meets any of the following enumerated circumstances:

"1. Whose parent, legal guardian, legal custodian, or other custodian subjects the child or any other child in the household to abuse, as defined in Section 12-15-301[, Ala. Code 1975,] or neglect as defined in Section 12-15-301, or allows the child to be so subjected.

"2. Who is without a parent, legal guardian, or legal custodian willing and able to provide for the care, support, or education of the child.

"....

"6. Whose parent, legal guardian, legal custodian, or other custodian is unable or unwilling to discharge his or her responsibilities to and for the child.

"....

"8. Who, for any other cause, is in need of the care and protection of the state."

In her brief to this court, the mother contends that the juvenile court's adjudication of dependency is not supported by clear and convincing evidence. She primarily relies on E.W. v. D.H., [Ms. CL-2024-

14

0202, Feb. 21, 2025] ___ So. 3d ___ (Ala. Civ. App. 2025) ("E.W. II"), to support her contention. For a full understanding of E.W. II, it is necessary to discuss E.W. v. Limestone County Department of Human Resources, 390 So. 3d 1103 (Ala. Civ. App. 2023) ("E.W. I"). On April 16, 2021, the Limestone County Department of Human Resources ("the Limestone County DHR") filed a petition alleging that C.N.H. was a dependent child based on a report that it had received indicating that there had been domestic-violence episodes in the home shared by C.N.H.'s mother and father, E.W. and P.H., respectively; that C.N.H.'s medication for an illness was not being properly administered by E.W. and P.H.; that the house in which E.W., P.H., and C.N.H. lived was inadequate and unclean; and that E.W. and P.H. were not properly supervising C.N.H.

Following ore tenus proceedings, on October 12, 2021, the Limestone Juvenile Court entered a judgment that adjudicated C.N.H. dependent, awarded legal and physical custody of C.N.H. to E.W., ordered E.W. to have no contact with P.H., awarded P.H. supervised visits with C.N.H., and ordered that C.N.H.'s paternal grandfather, D.H. ("the paternal grandfather"), and his wife, N.S., who had intervened in

the action, be allowed meaningful visitation with C.N.H. Subsequent to the entry of the October 12, 2021, dependency judgment, the paternal grandfather and N.S. and C.N.H.'s guardian ad litem filed motions seeking to have C.N.H. removed from the physical custody of E.W. for various reasons. After a hearing in December 2021, the Limestone Juvenile Court placed C.N.H. in the temporary custody of the paternal grandfather and N.S. The Limestone Juvenile Court conducted a review hearing on May 31, 2022, after which it entered a permanency order on June 7, 2022, determining that C.N.H. remained a dependent child and awarding custody of C.N.H. to the paternal grandfather and N.S., subject to specified visitation with E.W. E.W. appealed the June 7, 2022, permanency order to this court.

On September 1, 2023, this court reversed the Limestone Juvenile Court's June 7, 2022, permanency order because we found that the evidence that was presented at the May 31, 2022, permanency hearing was insufficient to support the finding that C.N.H. remained dependent. As we summarized in E.W. II, we concluded in E.W. I that

> "the Limestone County Department of Human Resources ('DHR') had become involved with the family based upon indicated domestic violence by P.H. ('the father'), some indication of neglect, and the need for parenting skills. At the

16

time of the permanency hearing in 2022, the mother had separated from the father. The mother had also completed classes on domestic-violence awareness, budgeting, and parenting as required by DHR. The mother had continued to take classes after completing the required courses. Also, the mother had secured employment as required by the juvenile court. The mother had never tested positive for any illegal drugs. The paternal grandfather and N.S. had complained that the mother had provided them with only $200 in child support. Even so, the mother essentially had had physical and legal custody of the child until December 7, 2021, and, following that, the mother had had unsupervised visitation every weekend during which she provided for the child's needs. Although counsel for the paternal grandfather and N.S. had made the point during cross-examination of the mother during the 2022 permanency hearing that the mother's prospects for higher-paying jobs were limited because of her having only a high-school diploma, we observed that poverty, in the absence of abuse or lack of caring, should not be the criteria for taking a child away from a parent. 390 So. 3d at 1117. The DHR social worker who testified at the permanency hearing stated that she had no concerns about the mother's ability to care for the child, and the juvenile court had awarded the mother unsupervised visitation with the child. E.W., 390 So. 3d at 1118."

E.W. II, ___ So. 3d at ___.

While E.W. I was pending on appeal before this court, the paternal grandfather and N.S. filed a petition in the Limestone Juvenile Court on May 3, 2023, seeking to terminate E.W.'s parental rights to C.N.H. In their petition, they alleged:

"'(1) that [E.W.] suffered from a mental illness and was unable to care for the child; (2) that [E.W.] had failed to

17

provide for the material needs of [C.N.H.]; (3) that [C.N.H.] did not have bowel movements on weekend visits with [E.W.]; (4) that [C.N.H.] would hide snacks in her overnight bag when packing for weekend visitation with [E.W.]; (5) that [C.N.H.] would use inappropriate language following her weekend visits with [E.W.] [and] that on one occasion [C.N.H.] had bruises, a swollen eye, and a bite mark that [E.W.] claimed were from [C.N.H.]'s younger sibling; (6) that on another occasion, [C.N.H.] had a handprint on her leg due to [E.W.'s] having spanked [her]; (7) that occasionally, [C.N.H.] had returned from visits with excrement on her clothing; (8) that [C.N.H.] would have tantrums before leaving to visit [E.W.]; (9) that [C.N.H.]'s pediatrician threatened to notify DHR if [C.N.H.] continued weekend visitation with [E.W.]; and (10) that [E.W.] had moved five times since [C.N.H.] was born and would likely never have consistent housing.'"

E.W. II, ___ So. 3d ___.

On September 7, 2023, after the issuance of our opinion in E.W. I, the paternal grandfather and N.S. filed a motion in the Limestone Juvenile Court seeking to temporarily retain custody of C.N.H. during the pendency of the termination-of-parental-rights action, based on the fact that C.N.H. had been in their custody for approximately one year. On September 13, 2023, the Limestone Juvenile Court awarded the paternal grandfather and N.S. temporary custody of C.N.H., subject to an award of supervised visitation to E.W. On September 27, 2023, after this court's certificate of judgment was issued and in compliance with our

18

decision in E.W. I, the Limestone Juvenile Court entered an order dismissing the original dependency petition.

A trial on the paternal grandfather and N.S.'s termination-of-parental-rights petition was scheduled to occur on January 11, 2024; however, on December 11, 2023, the paternal grandfather and N.S. filed an amendment to their petition. In their amended petition, the paternal grandfather and N.S. no longer sought to terminate E.W.'s parental rights; instead, they alleged that C.N.H. was dependent as to E.W. and P.H. Following a trial, the Limestone Juvenile Court entered a judgment on February 29, 2024, that again declared C.N.H. to be a dependent child and awarded custody to the paternal grandfather and N.S. subject to an award of supervised visitation to E.W. E.W. again appealed.

On appeal in E.W. II, this court agreed with E.W. and determined that the Limestone Juvenile Court's February 2024 judgment was not supported by clear and convincing evidence. In reversing the judgment and remanding the case for the entry of a judgment of dismissal, this court noted:

> "'In a dependency proceeding, the evidence must clearly and convincingly establish that the child is dependent <u>at the time of the disposition</u>.' <u>J.P. v. D.P.</u>, 260 So. 3d 862, 871 (Ala. Civ. App. 2018) (emphasis added). The mother had stable housing

19

and employment. The mother had sole custody of another child, the youngest child. The mother continued to seek a relationship with the child. While the mother does not have the financial resources that the paternal grandfather and N.S. have, there was insufficient evidence that the mother could not provide for the child. Cf. B.O. v. C.T., 416 So. 3d 1101, 1105 (Ala. Civ. App. 2024) (concluding, in a dependency case, that the grandparents' limited financial means had not prevented them from adequately parenting the child).

"This court has reviewed the record to determine whether the juvenile court could properly have determined from the evidence presented to it that the child was dependent. Even indulging the presumption in favor of the juvenile court's findings, we conclude that clear and convincing evidence to support a finding of dependency is absent. Parents and children have a fundamental right to maintain their relationship that does not evaporate simply because the parents 'have lost temporary custody of their child.' Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). This is especially true where the parent's initial loss of custody was based on judicial error."

E.W. II, ___ So. 3d at ___.

In the present case, the juvenile court failed to make findings of fact in support of its judgment adjudicating the child dependent; thus, this court assumes that the juvenile court made those findings that were necessary to support its judgment, unless those findings would be clearly erroneous. Ex parte Walters, 580 So. 2d 1352, 1354 (Ala. 1991). In her brief to this court, the maternal great-grandmother directs this court to evidence that she says supports the juvenile court's adjudication of

20

dependency. That evidence includes: the mother's alleged housing and transportation instability; the mother's having quit two jobs and her reliance on Z.G. for financial support; the mother's failing to consistently take her mental-health medication; the mother's allegedly "defiant" behavior; the mother's allegedly "filthy" home; mold on the child's car seat and mildew on the child's sippy cups; and the mother's lack of a bond with the child.

Evidence in the record on appeal supports the maternal great-grandmother's assertion that the child, who was two years old at the time of the trial, had been in her primary care since the child was one month old. However, as previously noted, this court dismissed the mother's appeal in <u>A.N.F.</u> based on a determination that the appeal had been taken from a void judgment because the juvenile court had maintained the child's placement with the maternal great-grandmother despite the juvenile court's having failed to adjudicate the child as a dependent child. We reiterate that, as this court stated in <u>E.W. II</u>:

> "Parents and children have a fundamental right to maintain their relationship that does not evaporate simply because the parents 'have lost temporary custody of their child.' <u>Santosky v. Kramer</u>, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). This is especially true where the parent's initial loss of custody was based on judicial error."

21

___ So. 3d at ___.

Regarding the mother's alleged housing and transportation instability, evidence established that the mother lived with her boyfriend, Z.G., and that they shared an automobile. The maternal great-grandmother points to testimony indicating that the mother and Z.G. had had an argument in December 2024 and that the mother had left the rental house that she had shared with Z.G. as the result of that argument. Testimony further indicated that, after staying one week at the maternal grandfather's apartment, the mother had returned to the rental house she shared with Z.G. Regardless of whether the mother's one-week absence from the rental house on that occasion represented a breakup, as characterized by the maternal great-grandmother, or a brief separation, as characterized by the mother, that event occurred eight months before the August 15, 2025, trial. "In a dependency proceeding, the evidence must clearly and convincingly establish that the child is dependent at the time of the disposition." J.P. v. D.P., 260 So. 3d 862, 871 (Ala. Civ. App. 2018). No evidence was presented indicating that the December 2024 argument between the mother and Z.G. continued to negatively impact the mother's housing stability or access to an

automobile at the time of the trial. To the contrary, the mother testified that she and Z.G. had maintained their relationship, that Z.G. had purchased a home they shared, and that she continued to have access to the automobile they shared.

Regarding the mother's employment, the mother testified that she had maintained two separate jobs but that she had quit both of those jobs when Z.G. had purchased a home and they had relocated, resulting in the mother's having a 40-minute commute to work, which she said was untenable. The mother further testified that she had secured employment at a fast-food restaurant, where, she said, she would be earning $11 per hour. No evidence was presented to refute the mother's testimony regarding her employment status. The mother may not have the financial resources that the maternal great-grandmother and her husband have; however, as in E.W. II, the record in the present case contains insufficient evidence indicating that the mother could not provide for the child.

Regarding the condition of the mother's house, B.F., the maternal grandfather's wife, said that, when she had visited the mother's house in December 2024, the mother's house was filthy and needed to be swept

23

and mopped. She also had observed old food on the stove. The mother admitted that there had been dirty dishes in her kitchen, but she explained that it was her routine to eat dinner after work and to wash dishes the following morning. Moreover, the mother testified that she and Z.G. had relocated and no longer resided in that house. Considering the scant evidence regarding the cleanliness of the mother's former house and the lack of evidence regarding the condition of her new house at the time of the trial, we find insufficient evidence to establish that the child was dependent because of the condition of the mother's house.

Regarding the child's alleged moldy car seat and mildewed sippy cups that B.F. had discovered in December 2024, the record lacks evidence suggesting that the child had been exposed to those items. Moreover, B.F. testified that the car seat, as well as the sippy cups, had been cleaned in December 2024. There was no evidence to suggest that the car seat or the sippy cups continued to be an issue at the time of the trial. J.P., 260 So. 3d at 871.

The mother testified that she had been prescribed the medications Celexa and Latuda to treat her bipolar disorder, depression, and anxiety. She admitted that, when she did not eat, she would not take her

medications because they made her nauseated. The maternal great-grandmother said that, when the mother had not taken her medications, she would be difficult to communicate with and would yell. Likewise, the maternal grandfather said that he also had concerns that the mother did not take her medications as prescribed. He, however, failed to provide testimony regarding any perceived negative effect on the mother's behavior that he attributed to her failure to take her medications. Moreover, the mother testified that she was compliant with her medication regimen at the time of the trial. Obviously, the juvenile court could disbelieve the mother's testimony on that point; however, the record lacks evidence from which the juvenile court could have been clearly convinced that the mother's failure to take her medications negatively affected her ability to parent the child.

Lastly, the maternal great-grandmother argues that the child was dependent because of the mother's lack of a bond with the child. The maternal great-grandmother initially received temporary custody of the child in July 2023, when the child was less than one month old. Since that time, the maternal great-grandmother had maintained custody of the child and the mother's contact with the child had been limited by the

juvenile court. On August 16, 2024, the juvenile court entered a final judgment in A.N.F., which provided a transitional schedule to revert custody of the child back to the mother. However, while operating under the terms of that judgment, the maternal great-grandmother filed the current dependency petition, and, on December 12, 2024, she secured an ex parte order that again limited the mother's contact with the child to supervised visitation every other Saturday, from 12:00 p.m. until 4:00 p.m.

The mother admitted that, despite her efforts and her wishes, she did not have a bond with the child. Regardless of the limitations the juvenile court placed on the mother's visitation, the mother bears some responsibility in her failure to bond with the child. Testimony suggested that, on occasion, the mother had failed to take full advantage of the visitation that she was afforded by remaining in the bathroom for extended periods during her visits. The extent to which the mother's actions contributed to her admitted lack of a bond with the child are uncertain. What is certain to this court, however, is that, considering the cumulative effect of this court's dismissal of the appeal in A.N.F., the procedural posture of this case, and the limitations the juvenile court

placed on the contact between the mother and the child during the initial dependency action and the current dependency action, it is not surprising that the mother has failed to develop a bond with the child.

In E.W. II, this court rejected the mother's failure to develop a bond with her child as the basis for her child's dependency, in part, because the mother and the child's relationship had been interrupted as a direct result of the juvenile court's having acted outside its discretion in finding the child to be dependent. ___ So. 3d at ___. Again, as we noted in E.W. II, "[p]arents and children have a fundamental right to maintain their relationship that does not evaporate simply because the parents 'have lost temporary custody of their child.'" ___ So. 3d at ___ (quoting Santosky v. Kramer, 455 U.S. 745, 753 (1982)). We find that reasoning applicable in the present case.

## Conclusion

This court has reviewed the record to determine whether the juvenile court had sufficient evidence to support its determination that the child is dependent. Even indulging the presumption in favor of the juvenile court's determination, we conclude that the record does not contain clear and convincing evidence to support a finding of dependency.

27

Thus, the juvenile court's judgment is reversed, and the case is remanded for the entry of a judgment dismissing the maternal great-grandmother's dependency petition.

REVERSED AND REMANDED WITH INSTRUCTIONS.

Hanson, Fridy, and Bowden, JJ., concur.

Moore, P.J., concurs in the result, without opinion.